Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  310-474-9111
Facsimile:  310-474-8585

Carter E. Greenbaum (SBN 344692)
**GREENBAUM OLBRANTZ LLP**
160 Newport Center Drive, Suite 110
Newport Beach, CA 92660
Tel: (332) 222-9119
Email:  carter@greenbaumolbrantz.com

Casey Olbrantz (*pro hac vice forthcoming*)
**GREENBAUM OLBRANTZ LLP**
244 Fifth Avenue, Suite C221
New York, NY 10001
Email: casey@greenbaumolbrantz.com

Joseph Delich (*pro hac vice forthcoming*)
Kyle Roche (*pro hac vice forthcoming*)
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th St., Suite 915
New York, NY 10017
Tel: 646-494-2900
Email: jdelich@fnf.law
Email : kroche@fnf.law

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| RAZA KHAN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br>        v.<br><br>FIGMA, INC.<br><br>                    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff RAZA KHAN ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendant FIGMA, INC. ("Figma") and alleges as follows:

## INTRODUCTION

1.      Figma juiced its valuation for its recent initial public offering by tens of billions of dollars by systematically stealing its customers' intellectual property.

2.      In the run-up to its IPO, Figma rolled out generative-AI products that catalyzed its sky-high valuation.  Figma developed those AI products by training its models on proprietary data and creative assets that customers had uploaded to the platform.  But Figma never asked its customers for permission.  To the contrary, for years Figma promised customers that it would not use their data for its own purposes, including to train AI models.  But last year, Figma silently and unilaterally opted vast swathes of its customers into its AI data training program.  As a result, those customers' intellectual property has been, and will ceaselessly be, misappropriated for Figma's benefit by unauthorized third parties that use Figma's products.  This class action seeks a permanent injunction to prohibit Figma's continued misuse of Plaintiff's and Class Members' intellectual property that Figma wrongfully used to train its AI models.

3.      Figma is a California-based technology company whose platform is used by countless professionals to create, store, and collaborate on creative assets in a cloud-based environment.  Due to the nature of Figma's products, Figma's customers must necessarily entrust it with the custody and protection of their intellectual property materials.  For many years, Figma has promised customers that you "own your User Content" and that "Figma does not claim any ownership rights in any User Content that you make available through the Services."  In reliance on such promises, Figma customers used the platform to generate and store terabytes of creative assets that were collectively worth tens or hundreds of billions of dollars.

4.      But last year, Figma seized troves of that customer data without consent.  In December 2023, Figma's proposed sale to industry giant Adobe, Inc. failed due to antitrust scrutiny.  Figma then postured for an IPO, and sought to bolster its valuation by rolling out new AI products.  Figma announced its pivot to AI on June 26, 2024, and updated its Terms of Service to putatively allow it to

1   "begin training on Customer Content for accounts with their 'Content Training' toggle on" as of "August

2   15, 2024."

3       5.      Figma's newly promulgated terms *did not* permit Figma to automatically "opt-in"

4   customers for AI training.  But, for two tiers of its customer base, Figma did just that, and unilaterally

5   set their "'Content Training' toggle on."  Figma had no right to take that action, which directly

6   contravened Figma's contractual commitments and violated customers' legal rights.  Indeed, mere

7   months earlier, the FTC issued a warning to companies that it is "unfair or deceptive" to "switch up the

8   'rules of the game' on consumers by surreptitiously re-writing their privacy policies or terms of service

9   to allow themselves free rein to use consumer data for product development."

10      6.      Nonetheless, in July 2024, Figma pressed forward and buried its intentions in a generic

11  email to customers that did not even disclose that Figma was automatically opting users into a setting

12  that allowed Figma to use their data for AI training.  Then, on August 15, Figma proceeded to convert

13  billions of dollars of customer intellectual property for its own ends, and amended its Terms of Service

14  to further obscure what it had done.

15      7.      Figma's IPO was immensely lucrative as a direct consequence of its misuse of its

16  customers' intellectual property.  The quality of Figma's AI products hinges on the quality of the data

17  used for training.  In short, the more sophisticated the training data, the more adept the AI model is in

18  generating useful and complex responses.  Figma's own AI product launch provides an example.  In

19  July 2024, before it began training on customer data, Figma launched a "beta" AI product.  Industry

20  experts quickly commented that "Figma AI looks rather heavily trained on existing apps."  For example,

21  one commenter noted that "multiple requests to design a weather app repeatedly resulted in a program

22  that was almost identical to the built-in iOS weather app that appears on Apple devices."  In response,

23  Figma promptly withdrew its tool from the market and admitted that it had inappropriately added "new

24  components and example screens ... that we simply didn't vet carefully enough."  But after exploiting

25  its customers' intellectual property for AI training, Figma re-launched the product and enjoyed

26  enormous financial gain.  It was valued at approximately $12 billion in January 2024.  But after

27  launching its customer-trained AI products, it increased various customers' prices by 20-30 percent, and

28  its first-day market capitalization as a public company in July 2025 surged to almost $70 billion.

8. Plaintiff is a successful investor and startup founder. In 2021, he began working on a project built around the concept of automating private credit origination and management. The project involved creating an application that could interpret private credit contracts and automate the process of implementing such contracts so that users could avoid costly hourly fees from lawyers and accountants. Plaintiff utilized Figma to develop a user interface, and he input proprietary software code into Figma so that he could use its services to build a mobile application and APIs necessary to create his product. But Plaintiff did not know that Figma would then utilize the code and software that he developed, through significant personal investments, to train its AI models. Had he known Figma's intentions, he would not have used Figma's services at all, would have removed his proprietary data from his Figma account, or would at least have "toggled off" his purported consent to AI training.

9. Plaintiff brings this action to rectify Figma's brazen misconduct, and brings claims for breach of contract, breach of the covenant of good faith, violations of California Unfair Competition Law, misappropriation of trade secrets under California and Federal law, violations of the California Computer Data Access and Fraud Act, and violations of the Stored Communications Act. Figma fed its customers' valuable intellectual property into its AI models so that Figma could profitably use that data to provide its other customers (including Class Members' commercial competitors) with similar digital assets. Currently, Figma allows any person to cheaply generate creative assets that mimic the assets that Plaintiff and Class Members collectively spent billions of dollars to develop. Under this status quo, Plaintiff and Class Members have and will suffer irrevocable loss of control over their brand assets, goodwill, trade secrets and other intellectual property rights in ways that cannot be reasonably quantified. By this action, Plaintiff and Class Members seek a permanent injunction to stop Figma's wrongful use of AI products that were trained on their intellectual property.

## JURISDICTION AND VENUE

10. **Divisional Assignment:** In accordance with Civil L.R. 3-2(c) and 3-5(b), this matter should be assigned to the San Francisco division because Defendant Figma is headquartered in San Francisco.

11.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1332(d) as the aggregate value of the injunction at issue in this case exceeds $5,000,000, at least one member of the proposed class is a citizen of another state, and the proposed class consists of more than 100 members.

12.     This Court has personal jurisdiction over Figma because it is headquartered within this District and its misconduct occurred, in substantial part, in this District.  Figma also marketed, sold, and distributed its products, including the AI products at issue, from this District to citizens of California.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Figma or its agents reside or may be found in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

14.     Plaintiff Raza Khan is an entrepreneur and business owner who resides in New York.

15.     Defendant Figma is a Delaware corporation with its principal place of business at 760 Market Street, Floor 10, San Francisco, California 94102.

## FACTUAL ALLEGATIONS

### A.     FIGMA'S PRODUCT LINES, BUSINESS MODEL, AND TERMS OF SERVICE

16.     Figma was founded in 2012 to develop a web-based collaborative design platform. Figma's stated mission is "to make design accessible to everyone."  It launched its first product, Figma Design, in 2015. Figma explains that Design is used to "create, share, and test designs for websites, mobile apps, and other digital products and experiences."  For example, software developers and designers can use Design to (1) brainstorm different solutions to user problems; (2) visualize different experiences and design features; (3) build the proposed designs, and, if needed, turn the designs into code; and (4) launch new websites, mobile apps, and other digital products.  Individuals and small businesses also use Design for, among other things, its simple-to-use graphic design tools.

17.     Figma Design eliminated the need for traditional desktop software, offered by companies such as Adobe, that was necessary to design and create websites, mobile apps, and other digital products.  Figma also built its user base by marketing itself as a real-time collaborative platform that allows multiple users to edit and comment simultaneously in the cloud.

18.     Figma Design was the company's sole product until 2021, when Figma launched FigJam, an online whiteboard for teams to brainstorm and plan design projects.  Per Figma, FigJam

"can be used for a wide range of purposes such as collaborative planning, team building and visualization of abstract ideas or processes."

19.    Since its founding, Figma has offered its products through a "freemium" model, which lets individuals and enterprises sign up at no cost, after which Figma attempts to convert free users to paid "seat-based" subscriptions.  For the past several years, Figma has offered four tiers of subscriptions:

(a)    **Starter Plan:** A free plan offering "basic design, presentation, and brainstorming tools," which "provides an easy way for new users to try our design and collaboration tools."

(b)    **Professional Plan:** A low-cost plan "designed for individuals and small teams" that provides "access to unlimited files and projects, as well as design libraries for a single team."

(c)    **Organization Plan**: A higher-cost plan "designed for businesses with multiple teams" that "allows everyone to collaborate in one Figma workspace while keeping everything safe and secure with centralized admin and security features."

(d)    **Enterprise Plan:** The highest-cost plan "designed for businesses managing multiple products or brands" with "custom team workspaces, automated design system management, and enterprise-level controls and compliance."

20.    For each paid plan, Figma charges flat fees for each "seat" or user in the plan, which are variable based on the type of "seat" sold.  Different types of seats come bundled with different products.

21.    Figma boasts that many of the world's largest mobile applications and websites utilize Figma, including Google Maps, Uber, JetBlue, Netflix, Duolingo, Claude, LinkedIn, Mercado Libre, and Airbnb.  But millions of consumers and small businesses have also utilized Figma to design their products and services.  In fact, Figma offers free accounts to students and teachers and boasts a significant number of such users.

22.    By their nature, Figma's products are designed to store, host, and process users' creative assets, design files, prototypes, and other proprietary or confidential intellectual property in a cloud-based environment.  Because all core functionality of the Figma platform requires users to upload, create, or collaborate on files within Figma's systems, users necessarily entrust Figma with the custody and protection of their intellectual property.  Figma's business model depends on this trust: Users cannot

1   meaningfully use the platform without relinquishing control over their designs to Figma's servers and

2   infrastructure.

3          23.     Figma therefore knows that its users reasonably expect that their creative assets will

4   remain secure, confidential, and protected against unauthorized access, disclosure, or misuse.  Indeed,

5   the Terms of Service and Privacy Policy to which Figma purports to bind customers are littered with

6   such assurances.  For example, and as particularly relevant to this action, every iteration of Figma's

7   Terms of Service has promised that customers "retain all right, title, and interest in Customer Content,"

8   which is defined as the "applications and materials" that customers "develop on or upload to" Figma.

9          24.     Notably, Figma's most recent Terms of Service provide that Customer Content may be

10  used by Figma "for the sole purpose of providing the Services and performing activities contemplated

11  by these Terms (such as maintaining, securing, debugging, and otherwise performing quality control for

12  the Services)."    That provision further provides that "the Figma AI terms (available at

13  figma.com/legal/ai-terms, last updated May 2, 2025) explain certain AI-related settings that apply to

14  Customer Content, and how to control those settings."    However, the Terms of Service do not

15  incorporate the "AI terms" by reference.  And, more broadly, no iteration of the Figma's Terms of

16  Service or AI terms have ever granted Figma permission to unilaterally "opt-in" a customer for AI

17  training.

18  **B.     FIGMA'S PRIMARY COMPETITOR, ADOBE, ATTEMPTS TO ACQUIRE**
        **FIGMA**
19

20         25.     In September 2022, despite Figma's then-limited product portfolio, Adobe Inc.

21  announced its intention to acquire Figma, Inc. for approximately $20 billion. The proposed acquisition

22  was widely publicized and positioned by both companies as a transaction that would integrate Figma's

23  collaborative design platform with Adobe's suite of creative tools.  Adobe's CEO stated that the

24  "combination of Adobe and Figma is transformational and will accelerate our vision for collaborative

25  creativity."[1]

26

27  _____

28  [1] Adobe, Adobe to Acquire Figma (Sept. 15, 2022), *available at* https://news.adobe.com/news/news-details/2022/adobe-to-acquire-figma.

CLASS ACTION COMPLAINT

26.     Notably, the strategic rationale Adobe publicly articulated for its proposed acquisition of Figma did not center on prospective artificial intelligence capabilities or future AI-driven features. Instead, Adobe consistently described the transaction as intended to combine Figma's existing collaborative design platform with Adobe's established creativity tools and to strengthen Adobe's position in the competitive product-design and interface-design markets.

27.     In mid-2023, while the acquisition was pending, Figma released a new product called "Dev Mode" that was designed to "bridge the gap between design and code" by translating design products into code.  Dev Mode allows developers to inspect designs and navigate, side by side, between design and code, as shown in the below screenshot of the product based on Netflix's video interface (code on right, interface on left):



28.     When Dev Mode was announced, it did not include any AI tools or functionality.  In November 2023, Figma launched its first AI feature in FigJam to summarize the content of group brainstorms and generate templates for team planning meetings, but those AI features were not incorporated in Figma's core Design or Dev Mode products.

29.     More broadly, throughout the entire period in which Adobe's acquisition remained pending, neither party publicly discussed AI tools or functionality within Figma's products.  Rather, public statements by Adobe executives during the merger-announcement period focused on integrating

Figma's platform with Adobe Creative Cloud, expanding Adobe's reach among product designers, and leveraging Figma's collaborative workflows—not on acquiring or accelerating any future AI technologies. Adobe repeatedly identified Figma's existing product-market fit, enterprise adoption, and collaborative infrastructure as the core strategic benefits of the deal.

30.     However, Adobe's proposed acquisition triggered extensive regulatory scrutiny in the United States and Europe, where competition authorities expressed concerns that the transaction would reduce innovation and eliminate a key competitive constraint in the product-design and creative-software markets. Ultimately, in December 2023, following increasing indications that regulators were likely to challenge the merger, Adobe and Figma jointly announced that they were terminating the acquisition agreement, and Adobe paid Figma a $1 billion termination fee.

## C.    FIGMA PIVOTS ITS STRATEGY TO LAUNCHING AI PRODUCTS

31.     The failure of Adobe's proposed $20 billion acquisition sent Figma scrambling to articulate a compelling basis for continued investor confidence in the company's long-term market position and revenue potential. In January 2024, Figma executed a private secondary sale of its stock that placed its valuation at approximately $12.5 billion—almost half of the sale price Adobe proposed in 2022.

32.     Left without a suitable acquirer and with a deflated valuation, Figma began posturing for an initial public offering, and sought to reinvent its product portfolio in a revised go-to-market strategy that focused on implementing new AI tools.

33.     In June 2024, Figma announced "Figma AI", which it described as "a collection of features designed to help you work more efficiently and creatively." Those tools enabled users to, for example, "rapidly turn static mocks into interactive prototypes," or generate designs from text prompts.[2]

34.     In a blog post dated June 26, 2024, Figma's CTO explained: "All of the generative features we're launching today are powered by third-party, out-of-the-box AI models and were not trained on private Figma files or customer data." However, the CTO added that, in order to make "improvements" to the AI product, "we need to train models that better understand design concepts and

---

[2] Meet Figma AI: Empowering Designers with Intelligent Tools | Figma Blog, *available at* https://www.figma.com/blog/introducing-figma-ai/.

patterns, and Figma's internal formats and structure through Figma content."  Notwithstanding, he promised that "all admins have control of whether their team's content data is used for training," that "participation in AI content training is not required to use Figma or Figma's AI features," and that Figma was "committed to building this in a principled way that protects your privacy."

35.    Immediately upon the launch of Figma AI, customers and the general public noticed that Figma's new AI tools appeared to infringe on popular creative designs.  For example, on July 2, 2024, Andy Allen, the CEO of Not Boring Software, tweeted that "Figma AI looks rather heavily trained on existing apps."  His post compared a "weather App" created using Make Designs with Apple's Weather App, as shown in the below tweet, which had over 1.5 million views on Twitter.



36.     Figma faced immediate backlash in extensive media coverage that accused it of infringing on Apple's intellectual property.  In response, Figma's CEO tweeted that the "Make Design feature is not trained on Figma content, community files or app designs."  Rather, Figma attributed the issue to "new components and example screens [that] were added that we simply didn't vet carefully enough."  Figma admitted that a "few of those assets were similar to aspects of real-world applications, and appeared in the output of the feature with certain prompts."  Ultimately, Figma apparently removed the assets from its design systems and withdrew the AI feature from the market until it could improve the QA process.

37.     Figma then retooled its AI features—including by training its models on customer data—and began launching a flurry of new AI features and products to pave its path towards an initial public offering in 2025.  In particular, Figma updated its existing slate of products to include several AI features, and it launched several new products with AI features, including Figma Sites, Figma Make, and Figma Buzz in quick succession.  Figma Sites lets customers design a website and directly publish it to the web.  Figma Make is an AI-powered product that turns a prompt into a design prototype.  Figma Buzz assists designers with creating social media assets, display ads, and other marketing materials.

38.     Figma's AI offerings were central to the investment thesis it advanced to the public. Figma framed AI not as a marginal enhancement to its products, but as a transformative capability that justified a higher valuation in the absence of the Adobe acquisition.  By the time Figma went public in the summer of 2025, its prospectus mentioned AI *153 times*.  The prospectus explained "AI has the power to accelerate the process of going from idea to product even further."  Figma stated that "[w]e believe AI is fundamentally transforming the product development process" and that its new AI tools are designed for "this new paradigm."

### D. FIGMA SYSTEMATICALLY MISUSED USER INTELLECTUAL PROPERTY TO TRAIN ITS AI TOOLS

#### 1.   AI Tools and the Training Process

39.     AI tools work by identifying patterns across vast datasets. During a process known as "training," an AI model analyzes large volumes of input data—images, text, or other content—and uses that information to learn relationships and structures that allow it to generate or predict outputs.  Each

iteration of training adjusts the model's internal parameters based on patterns in the data, allowing it to make inferences or generate new content resembling the examples it has seen. The more varied, high-quality, and context-rich the data, the more accurate and capable the resulting model becomes.

40.     For generative design models like those Figma developed, access to authentic, human-created design files is uniquely valuable.  These files capture real-world creative decisions—typography, layout, color balance, user-interface hierarchy, and collaborative annotations—that synthetic or publicly scraped data cannot replicate.  Companies seeking to develop design-assistance or "smart layout" features therefore require enormous quantities of labeled and contextually consistent design data.  Because such datasets are not publicly available, companies with proprietary access to user content—such as Figma—possess a significant and non-replicable competitive advantage.

41.     As the Federal Trade Commission (FTC) has explained, "[d]eveloping AI models can be a resource intensive process, requiring large amounts of data and compute."  Companies employing AI models thus have a "continuous appetite for data to develop new or customer specific models or refine existing ones."  The FTC recognizes: "[t]his business incentive to constantly ingest additional data can be at odds with a company's obligations to protect user's data, undermining peoples' privacy, or resulting in the appropriation of a firm's competitively significant data.  This risk is particularly salient given that customers may reveal sensitive or confidential information when using a company's models, such as internal documents and even their own users' data."[3]

### 2.  Figma Changed Its Terms and Automatically Opted Users Into AI Training

42.     In order to roll out its new products and AI features, Figma needed to leverage large data sets to train its AI models, and decided to use its own internal trove of highly valuable customer data.  Specifically, despite its prior promises that it would not do so, on or around August 15, 2024, Figma began using data uploaded and created by its Starter and Professional subscribers to train its AI models (including its free accounts for students and teachers).

---

[3] *AI Companies: Uphold Your Privacy and Confidentiality Commitments*, Fed. Trade Comm'n, (Jan. 9, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/01/ai-companies-uphold-your-privacy-confidentiality-commitments

43.    In and around early July 2024, given that Figma's Terms of Service did not permit it to unilaterally train on customer creative assets, Figma sent an email to some customers to try and obtain passive "consent" to its new practice.  Upon information and belief, Figma did not send the update to all of its customers, including Plaintiff, who received no announcement about the change from Figma. Figma's email read as follows:

> We recently announced a beta for AI features in Figma Design. In this email, we are sharing **our approach to building AI** features and what's next.
>
> To improve these features, we plan to start training AI models to understand design concepts, patterns, file structure, and tooling in Figma. Learn more about how your team can manage AI and our other updates below.
>
> ## Managing AI settings
>
> Team admins can control how their teams use AI with two new settings for each team they manage:
>
> - Whether your team can use AI features *(on by default for Starter and Professional teams)*.
> - Whether content is shared for AI training *(on by default for Starter and Professional teams)*.

44.    The email went on to state that "AI features and content training are optional," and "Teams can use AI features, even if content training is turned off."  It also stated that its new terms "Allow Figma to use your team's content to improve AI features, when content training is set to 'on.'"

45.    Figma's email notice was confusing and misleading in many ways.  First, it did not explicitly inform customers that content training was turned on by default.  Instead, it buried that critical information in a confusing subordinate clause that used passive voice and thus did not identify what content would be "shared" or with whom (i.e. "Whether content is shared for AI training (on by default for Starter and Professional Teams)").  Second, the critical information was further buried in a parenthetical clause within the confusing subordinate clause.  Third, the email stated that the content training setting affected "how their teams use AI," but did not disclose that those settings impacted how Figma's new AI tools *use* customers' data.  Fourth, the email included other text that implied Figma did not automatically opt customers into data sharing.  For example, the email stated that "AI features and

1  content training are optional."  Finally, the email—to the limited extent customers received it, noticed

2  it, and understood it—provided just six weeks to "opt-out" of data training.

3      46.    Figma chose to automatically opt-in its customers for AI training notwithstanding that,

4  in February 2024, the FTC warned companies against obtaining "artificial consent" from customers for

5  data training.  The FTC warned, among other things, that "It may be unfair or deceptive for a company

6  to adopt more permissive data practices—for example, to start sharing consumers' data with third parties

7  or using that data for AI training—and to only inform consumers of this change through a surreptitious,

8  misleading and unfair amendment to its terms of service or privacy policy."

9      47.    Plaintiff did not receive any email or other notice from Figma concerning their change

10  and the default setting that would be applied to his account.  On information and belief, numerous other

11  customers did not receive any notice.

12      48.    Figma's customers that did receive and understand the notice inundated online message

13  boards with complaints about Figma's new practice.  On Reddit, customers commented that this "hail-

14  mary move[]" was a "result of failed adobe buyout."  Designers called it "another slimy move by

15  Figma" and "really scummy."  On Figma's own message boards, customers called the change "pure

16  evil.  AI should [] have to be off by default and users must opt-in."  Months afterwards, another

17  customer—whose data had likely already been used by Figma—wrote "How did this go unnoticed?  I

18  haven't logged in my account in months and I'm just learning about this."

19      49.    Figma opted-in customers for data training only for those on its Starter and Professional

20  subscription plans (including the free accounts for students and educators).  As Figma acknowledges,

21  such customers tend to be smaller businesses, startups, and individuals.  But Figma chose to treat its

22  premium-tier customers differently, and did not automatically opt them in for data training.  Figma gave

23  no justification for that distinction at the time.  Indeed, it was unjustifiable.  As one privacy expert

24  observed: "What makes this particularly bad is the deliberate choice to exempt enterprise customers

25  while silently enrolling individual designers and small teams.  The message is clear: your privacy and

26  intellectual property rights are directly proportional to how much you pay."[4]

27

28  ―――――――――――――――――――
[4] *Figma: How to opt out of AI features?* Hall of Shame (Sept. 4, 2025), https://hallofshame.design/figma-how-to-opt-out-of-ai-features/.

50.    Contemporaneous with its announcements on AI training, Figma also rolled out an entirely new set of "AI Terms," which Figma purports to refer to (but does not incorporate by reference into) its current Terms of Service.  Figma's AI Terms state that "When 'Content Training' is toggled on within your administrative user settings, Figma may use your Customer Content to maintain, improve, and enhance Figma's products and services by training machine learning and artificial intelligence algorithms and models."  The AI Terms, however, did not disclose then (and still do not disclose) that Figma defaults that setting "on."  Nor has any iteration of Figma's AI Terms (or Terms of Service) given Figma discretion to unilaterally "opt-in" customers for data training.

51.    Similarly, Figma's current Terms of Service, issued on June 18, 2025, continue to state that customers "authorize Figma and its service providers to use Customer Content for the sole purpose of providing the Services and performing activities contemplated by these Terms (such as maintaining, securing, debugging, and otherwise performing quality control for the Services.)," and do not indicate that Customer Content might be used to train AI models.  Instead, the Terms of Service merely note: "Also, the Figma AI terms ... explain certain AI-related settings that apply to Customer Content, and how to control those settings."  Users are not asked to agree to those AI Terms as a condition of utilizing the service, and Figma's updated Terms of Service do not purport to incorporate the AI Terms by reference.

52.    In short, Figma's own terms *never* permitted Figma to automatically "opt-in" customers for AI training.  Figma had no right to take that action, as it directly contravened Figma's contractual commitments and violated customers' legal rights.  And to the extent Figma was legally capable of engineering passive "consent" from customers to train its AI on their data—it was not—its purported attempts to provide notices in July 2024 fell woefully short of fairly alerting customers to Figma's intentions.

### 3.    Figma's AI Training Directly Conflicts With Its Past Representations and Promises

53.    Figma's customers used Figma's services with the express understanding that they would continue to own all rights in the valuable intellectual property they uploaded to Figma and designed using Figma, and that Figma would not share that data, including to train its AI tools.

54.     Since 2018, Figma has told its customers "You own your User Content."[5]  Its earliest Terms of Service also promised customers, "Figma does not claim any ownership rights in any User Content that you make available through the Services and nothing in these Terms will be deemed to restrict any rights that you may have to use and exploit your User Content."

55.     Since 2018, Figma's Terms of Service has also stated that "you own all right, title, and interest in any application(s) and/or material(s) that are developed by you on the Services or uploaded to the Services by you ('Customer Content')."   The terms also state, "Except as expressly set forth in these Terms, each party retains all right, title, and interest in and to its intellectual property rights."

56.     Figma's website includes other promises suggesting that it would protect customer data. For example, Figma's website states that "Figma respects the intellectual property rights of others and expects its users to do the same."

57.     Figma also made specific promises about its use of AI tools, which customers relied on when using Figma's product.  In particular, when Figma first rolled out its initial AI tools for its FigJam product in November 2023, it provided notice to all of its customers, including Plaintiff, which disclosed that Figma would begin using OpenAI as a subprocessor.  Figma explained: "We will only send the information you provide when using AI features.  We also have an agreement that prohibits OpenAI from using any Figma customer data for training purposes."

58.     Moreover, following the backlash from Figma's infringement of Apple's weather App, Figma's CEO tweeted in July 2025 that "Make Design feature is not trained on Figma content, community files or app designs."  But at the very same time he made those highly public statements that Figma made stating it would not use "Figma content, community files or app designs" to train its AI tools, Figma was purportedly sending out notices that it would begin unilaterally training on customer data the very next month.

---

[5] The Terms define User Content to mean "any Content that Users (including you) provide to be made available through the Services, including without limitation any Designs and Project Content created by a User (other than the Tools and any other Content that we provide to you) as well as modifications a User makes to another User's Designs, digital typefonts or font files ("Fonts") and Applications."

**E. Figma Breached Its Obligations to Plaintiff by Using His Data to Train Its AI Models**

59.    Plaintiff created an account with Figma in July 2023 to help design digital experiences for his startup Begin Corporation.  Plaintiff raised $1.7 million for Begin Corporation to develop legally enforceable programmatic agreements to reduce the cost of drafting, entering, operating in accordance with, and enforcing business contracts that include core operations and financing arrangements, thereby helping customers save on costly hourly fees from lawyers and accountants needed to interpret, implement, and enforce those contracts.

60.    The materials that Plaintiff uploaded, created, and stored on Figma's platform included highly valuable intellectual property, including proprietary product designs, user interfaces, software architecture, confidential prototypes, unreleased materials, brand assets, internal workflows, and software code.  These materials derive independent economic value from not being generally known and were developed through substantial investment, expertise, and labor.

61.    Like many users, Plaintiff created his account as a free Starter subscription.  Upon information and belief, as a condition of creating an account, Plaintiff accepted Figma's Terms of Service dated March 7, 2023.

62.    Section 3.5 of those terms promised Plaintiff "you own all right, title, and interest in any application(s) and/or material(s) that are developed by you on the Services or uploaded to the Services by you ("User Content")."   It also stated that, "Except as expressly set forth in these Terms, each party retains all right, title, and interest in and to its intellectual property rights." *Id.*

63.    The Terms also incorporated Figma's Privacy Policy.  As with Figma's Terms of Use, Figma's Privacy Policy did not provide any notice that Figma would use User Content to train its AI tools.  To the contrary, the Privacy Policy provided a list of third parties with whom Figma shared data. While training its AI tools provides Figma's other users with access to Plaintiff and Class Members proprietary data, Figma's Privacy Policy discloses only that it will provide "other users of Figma's services" access to your data "when you use the Services to collaborate or interact with others…."  It also discloses that User Content may be made publicly available only if you make such content available publicly and that "[y]ou can check at any time whether particular content is public or private by viewing

1    the content's settings."  Upon information and belief, Plaintiff's User Content has always been set to

2    private.

3        64.    Plaintiff and designers working with and for him began iterating on custom designs to

4    build their startup using Figma's platform.  By October 2023, Plaintiff upgraded to a paid "Professional"

5    subscription to leverage additional Figma tools, subject to the same Terms of Service.  At that time,

6    Plaintiff received notice that Figma would begin utilizing OpenAI, but Plaintiff relied on the promise

7    that Figma would not use his content and proprietary data to train its AI models.

8        65.    Plaintiff and others working with him continued to utilize Figma's products and services

9    to design Begin Corporation's design interfaces for several years.  During that period, Figma never

10    disclosed to Plaintiff that it had changed its Terms of Service to permit it to use his data to train its AI

11    tools.

12        66.    Plaintiff and Class Members took reasonable measures to maintain the secrecy of their

13    design materials, including storing their projects in private workspaces, restricting collaborator access,

14    utilizing device and account authentication protections, and relying on Figma's explicit contractual

15    commitments that users "own all right, title, and interest" in all content created or uploaded to the

16    platform.

17        67.    By utilizing Plaintiff's and Class Members' data to train its AI models, Figma breached

18    its Terms of Service by co-opting for itself rights in Plaintiff's intellectual property.  Figma also breached

19    its Terms of Service by failing to disclose that it could disclose User Content to third parties by training

20    its AI models on that content.

21        68.    When Plaintiff finally learned of Figma's surreptitious change in the summer of 2025,

22    he emailed Figma's customer support team to complain that he had been inappropriately opted into

23    content training.  On July 16, 2025, Figma responded to his complaint by stating that "the announcement

24    regarding AI content training was made last year during our Config 2024 event, and we followed up

25    with detailed emails to all Figma customers."  Plaintiff did not follow Figma's "Config event" nor

26    receive that follow-up email but, as explained above, even if he had, it would not have provided

27    adequate notice of Figma's change.  Figma's customer support team went on to explain: "For users on

28    Starter and Pro plans, the default was to opt-in, unless the AI feature was previously turned off in

FigJam." In response, Plaintiff informed Figma that "By opting us in without our consent you stole our intellectual property."

69.    Had Plaintiff known that Figma would irreversibly appropriate his materials for AI training, Plaintiff would not have used Figma's services at all, would have removed his proprietary data from his Figma account, or would at least have "toggled off" his purported consent to AI training.

## F.  FIGMA HAS WRONGFULLY PROFITED FROM ITS UNLICENSED EXPLOITATION OF CUSTOMER INTELLECTUAL PROPERTY MATERIALS

70.    Figma's customers routinely upload, create, and collaborate on highly valuable intellectual property within the Figma platform, including, for example, proprietary product designs, user interfaces, software architectures, marketing assets, brand concepts, confidential prototypes, and other pre-release materials. These design files often represent core competitive assets and goodwill of the companies and individuals who create them, including trade secrets, trademark and copyright material, commercially sensitive strategies, and unreleased product roadmaps.

71.    The scope of this material is enormous. Figma is used by independent creators, start-ups, and large enterprises alike, many of whom rely on the platform as the primary environment in which their design teams generate and iterate on key intellectual property. As a result, Figma was entrusted with vast quantities of commercially sensitive, high-value creative work.

72.    The aggregate value of the intellectual property stored, created, and collaboratively developed on Figma's platform is also enormous, and, on information and belief, is reasonably measured in the tens or hundreds of billions of dollars. Figma is used by millions of designers and companies, and it hosts design assets tied to products and services that generate hundreds of billions of dollars in annual downstream economic activity, making the cumulative value of the proprietary materials on the platform exceptionally high and far exceeding the value of the platform itself. As Figma itself recognizes, "billions of people around the world use apps, websites, and other digital experiences that are made in Figma."[6]

---

[6] Figma, S-1 Propsectus at 149 (June 28, 2025)

73.    Through its AI training practices, Figma unfairly captured a tremendous amount of that value at its customers' expense.  Its AI products depend not merely on file images but on the embedded object structures and collaboration data within each project—e.g., layer names, editing history, and cross-team comments. This internal activity data provides insight into how professional designers make choices, iterate, and respond to feedback, which in turn enables Figma's algorithms to simulate professional workflows.  The success of any machine-learning model is directly proportional to the quantity, diversity, and fidelity of its training data. Even small improvements in dataset size can yield significant gains in model quality. Figma's tens of millions of user projects across thousands of industries supplied an unparalleled corpus of real design work—content unavailable through open-source or public repositories.

74.    By training its AI systems on these user-generated works, Figma not only improved the accuracy of its predictive tools but also created new revenue-generating products—such as "Figma AI," "Make," and "Buzz"—the core capabilities of which were built on patterns extracted from its users' proprietary data.

75.    Figma did not fairly disclose to users that their creative work product would be analyzed or incorporated into training datasets for these commercial AI models. Nor did it obtain informed, opt-in consent.

76.    As a result, Figma exploited a closed, involuntary data pipeline: customers' subscription payments and creative work simultaneously funded and supplied the raw material for Figma's AI development—without consent, compensation, or attribution.

77.    Figma's unilateral use of user content for AI training was not incidental to providing the design service; it was a separate and commercially significant enterprise.  Figma's SEC filings highlight its investment in "machine learning" as a key growth vector and credit its product differentiation to "proprietary datasets derived from user activity."  In fact, investors have noted that Figma's growth from a $12.5 billion valuation after the abandoned Adobe acquisition in 2022 to the $68 billion market cap it achieved immediately following the IPO was driven largely by its adoption of AI and rollout of its AI products and tools.

78.    The competitive and financial value of those datasets stems directly from users' contributions. Each uploaded design file increased Figma's ability to train and refine its AI models, thereby enhancing Figma's market position and valuation—while simultaneously exposing customers' confidential design concepts, brand assets, and internal workflows to unconsented analysis and distribution.

**G. FIGMA SHOULD BE ENJOINED FROM USING AI PRODUCTS THAT WERE WRONGLY TRAINED ON CUSTOMER INTELLECTUAL PROPERTY**

79.    By incorporating Plaintiff's and Class Members' intellectual property into its AI products, Figma used and exploited assets that did not belong to it and that users were required to entrust to the platform solely to make legitimate use of its design tools.

80.    Every time Figma deploys its AI features, it necessarily reproduces, internalizes, or generates outputs influenced by improperly used customer intellectual property.  Because modern AI systems cannot meaningfully "unlearn" or remove specific data once it has been incorporated into data training, Plaintiff's and Class Members' intellectual property is now embedded within Figma's AI models in a manner that is irreversible.  Plaintiff and Class Members cannot retrieve, delete, or control this information, and Figma cannot excise it—even if it wished to.

81.    Furthermore, Figma's use of Plaintiff's and Class Members' creative work for AI training diminished the value of that intellectual property by stripping it of exclusivity, confidentiality, and competitive advantage. Design decisions, stylistic approaches, structural ideas, workflows and processes, and creative outputs are now reflected in Figma's generative and assistive AI tools available to other users, including competitors.  Figma's AI systems can now generate outputs derived in part from Plaintiff's and Class Members' works, enabling other users to obtain derivative design elements without permission and without incurring the costs, time, or creative labor that Plaintiff invested, all while enriching Figma.  This erodes competitive positioning, diminishes the exclusivity of work product, and undermines the economic value of the designs that were misused.

82.    In the absence of the relief sought by this action—a permanent injunction—Figma's misuse of customer content will have continuous and irreversible consequences.  Plaintiff and Class Members will have permanently lost control over the use of their intellectual property materials. The

knowledge and intellectual property embedded in Figma's models will continue to reflect, reproduce, and monetize insights drawn from users' proprietary designs long after those files are deleted or accounts closed.

83.     Because the injuries caused by Figma's misconduct are ongoing, irreparable, and are not readily amenable to redress through damages, and because Figma's misconduct threatens the integrity of consumers' intellectual property on a massive scale, Figma must be enjoined from using any AI products that were trained, in whole or in part, on Plaintiff's and Class Members' data.

## CLASS ALLEGATIONS

84.     Plaintiff incorporates the above allegations as if fully set forth below.

85.     This action is brought by Plaintiff individually and on behalf of the Class Members, as defined below, pursuant to Fed. R. Civ. Pro. 23(a), (b)(3) and 23(b)(2), and (c)(4).

### Nationwide Class

> All persons and entities in the United States that subscribed to Figma's services and whose intellectual property was subsequently misused by Figma to train its AI models ("Class Members").

86.     Excluded from the Class are Figma and its subsidiaries, affiliates, officers, directors, and any entity in which Figma has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

87.     Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

88.     Numerosity: The class is so numerous that joinder of all Class Members in a single proceeding would be impracticable.  While the exact number of members of the class is unknown at this time and can only be determined by appropriate discovery, Plaintiff is informed and believes that the class likely includes tens of thousands, and potentially hundreds of thousands of members.  As of March 31, 2025, Figma disclosed that it had 450,000 paid subscribers.  Therefore, the Class is sufficiently numerous that joinder of all members in a single action is impracticable, and the resolution of claims through the procedure of a class action will benefit the parties and the Court.

89.    <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individuals. Such common questions of law or fact include, among other things:

  a.    Whether Figma engaged in unfair and deceptive practices by misleadingly and unfairly changing its Terms of Service to permit AI training of its customers' data;

  b.    Whether Figma engaged in unfair and deceptive practices by using Class Members' intellectual property materials to train its AI models; and

  c.    Whether Figma violated its contractual obligations to Class Members by using their intellectual property materials to train its AI models.

90.    Figma engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of all other Class Members.  Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

91.    <u>Typicality:</u> Plaintiff's claims are typical of the claims of the Class Members. Plaintiff, like all proposed members, created an account with Figma under terms that promised Class Members that their intellectual property rights would be respected.  All of Class Members' materials were then utilized by Figma's AI data training process.

92.    <u>Adequacy:</u> Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representatives of the class and has no interests adverse to, or in conflict with, the class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in complex civil litigation and class actions.

93.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  This action is also appropriate as a class action pursuant to Fed. R. Civ. Pro. 23(b)(2) because Figma's decision to train its models on a large trove of the class's intellectual property materials affects Class Members in the same way, and any injunctive relief awarded will affect the class as a whole.

94.     Figma's Terms of Service state that "You and Figma both agree to resolve disputes arising out of or relating to these Terms, your use or contemplated use of the Services, or any aspect of your relationship or transactions with Figma (each, a "Claim") in binding arbitration instead of court, except that either party may bring suit in court to enjoin the infringement or other misuse of intellectual property rights." Because the agreement explicitly carves out suits to "enjoin the infringement or other misuse of intellectual property rights," this class action may be maintained in this Court.

95.     The Terms of Use also states, in all caps, "You agree to resolve your claims with Figma solely on an individual basis, and not as part of a class, representative, or consolidated action." That provision is unenforceable under California law. And regardless, it pertains only to Claims brought in arbitration as it is contained under a heading that refers to "what is arbitration?" It also states that "Unless you opt out of arbitration, you and Figma both are waiving the right to pursue or have a dispute resolved as a plaintiff or member in any class, representative or consolidated action."

96.     Adequate notice can be given to Class Members directly using information maintained by Figma.

## COUNT I: BREACH OF CONTRACT

97.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein

98.     Plaintiff, Class Members, and Defendant entered into express contracts when they created accounts with Figma, which are uniform with respect to the provisions applicable to the claims asserted against Defendant. Plaintiff and Class Members were required to agree to Figma's Terms of Service as a condition of creating their account.

99.     Plaintiff and Class Members performed all conditions, covenants, and promises required to be performed on their part in accordance with the terms and conditions of the contract, except to the extent such performance was excused, released, or waived by the actions, conduct, or agreement of Defendant.

100.     Through the Terms of Service, Figma promised that Plaintiff and Class Members "own all right, title, and interest in the content you create or upload to the Services ('Customer Content')."

101.    The Terms of Service do not authorize Figma to use Customer Content to train, fine-tune, or improve AI models.  To this day, Figma's Terms of Service do not bind users to Figma's AI Terms, and thus Figma is continuing to breach its contracts with users by using their data to train their AI models.

102.    Defendant breached its contractual obligations with Plaintiff and Class Members by using their data to train Figma's AI models.

103.    Defendant further breached its contractual obligations with Plaintiff and Class Members by generating content with its AI products that utilize Plaintiff and Class Members' data.

104.    As a direct and proximate result of Defendant's breaches, Plaintiff and Class Members face ongoing and irreparable harm because Figma continues to operate, deploy, and commercialize AI models and AI-generated outputs that were trained, in whole or in part, on Plaintiff's and Class Members' data.  Monetary damages cannot remedy this continuing misuse or restore the confidentiality, exclusivity, or value of the intellectual property that Figma has already incorporated into its AI systems.  Accordingly, Plaintiff and Class Members are entitled to permanent injunctive relief prohibiting Figma from using AI models that were trained on, derived from, or that rely upon data obtained in breach of the parties' contracts.

## COUNT II: MISAPPROPRIATION OF TRADE SECRETS
### (Cal. Civ. Code § 3426)

105.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

106.    Plaintiff and Class Members created, uploaded, and stored confidential and highly valuable intellectual property within Figma's platform, including proprietary product designs, unreleased prototypes, user-interface and user-experience systems, internal workflows, engineering logic, application code, branding assets, and other nonpublic commercial information (collectively, "Trade Secret Materials").

107.    The Trade Secret Materials constitute "trade secrets" under Cal. Civ. Code § 3426 because they derive independent economic value from not being generally known to the public or to competitors who could obtain economic value from their disclosure or use.

108.    Plaintiff and Class Members took reasonable measures to maintain the secrecy of their Trade Secret Materials, including storing them in private Figma workspaces, limiting account access, sharing only with trusted collaborators, utilizing authentication protections, and relying on Figma's express representations that users retain all ownership and rights in their content and that such content would not be used for AI training or other secondary purposes without consent.

109.    Figma acquired, used, and disclosed these trade secrets through improper means and without consent by mining private Figma files to train its AI models, in violation of Cal. Civ. Code § 3426.1(b).

110.    Figma used and disclosed Plaintiff's and Class Members' Trade Secret Materials without consent by incorporating them into datasets used to train, validate, refine, and commercialize its AI products and generative-design tools, including but not limited to Figma AI, Make, and Buzz.

111.    Figma knew or had reason to know that it had acquired Trade Secret Materials through improper means and that its use and disclosure of those materials was unauthorized. Figma selectively excluded enterprise customers from its auto-opt-in training programs, confirming that it understood consent was required

112.    Figma's conduct was knowing, willful, and malicious. Figma understood that User Content stored on its platform—including Plaintiff's and Class Members' private design files—was confidential, proprietary, and of significant commercial value.

113.    As a direct and proximate result of Figma's misappropriation, Plaintiff and Class Members suffered and continue to suffer substantial harm, including loss of secrecy, competitive disadvantage, dilution of the value of their intellectual property, and permanent embedding of their Trade Secret Materials within Figma's AI model.

114.    Monetary damages alone are inadequate to compensate for the ongoing and irreparable harm caused by Figma's conduct. Plaintiff and Class Members are entitled to injunctive relief under Cal. Civ. Code § 3426.2 to prevent further use or disclosure of their Trade Secret Materials.

115.    Figma publicly represented—on its website, in onboarding materials, in blog posts, and within its Terms of Service—that users retained ownership of their uploaded and created content. These

representations were disseminated to Plaintiff and Class Members pursuant to Cal. Bus. & Prof. Code § 17500 *et seq*.

116.    Figma's marketing repeatedly emphasized privacy, user control, and creative autonomy. Figma's representations were materially false and misleading.  In reality, Figma collected and stored users' project data, design files, and metadata, and subsequently used or permitted use of that data to train, refine, or test artificial-intelligence models and other automated systems designed to generate or optimize creative content.

117.    Figma failed to disclose these practices in its consumer-facing representations, and instead continued to market the service under the premise that users' work remained "their data" and would not be repurposed without consent.

118.    Reasonable consumers, including Plaintiff and the members of the proposed Class, understood Figma's representations to mean that their uploaded materials would be used solely to provide the design-collaboration services they purchased, not for unrelated machine-learning or AI-training purposes.

119.    Plaintiff and Class Members relied on these representations and omissions when deciding to create accounts, upload content, and pay for Figma's subscription services.

120.    Had Figma disclosed that it would use customer content and associated data to train or improve AI models—or that its internal and third-party systems would analyze, replicate, or generate derivative works from such data—Plaintiff and Class Members would not have used or paid for Figma's services on the same terms, or at all.

121.    By misleading consumers and other users as to Figma's use of customer content and data, Figma failed to comply with Cal. Bus & Prof Code 17500.6 and the requirement to disclose "a complete list of restrictions and conditions" of the license that Figma provided its users for its services.

122.    Pursuant to Bus. & Prof. Code § 17535, Plaintiff seeks injunctive relief prohibiting Figma from continuing to misrepresent or conceal its data-use and AI-training practices

## COUNT III: MISAPPROPRIATION OF TRADE SECRETS
### (Defend Trade Secrets Act – 18 USC § 1836)

123.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

124.    Plaintiff and Class Members developed, uploaded, and stored confidential and proprietary business information within Figma's platform, including Trade Secret Materials.

125.    The Trade Secret Materials constitute "trade secrets" under 18 U.S.C. § 1839(3), because they derive independent economic value from not being generally known to the public and not being readily ascertainable by competitors who could obtain economic value from their disclosure or use.

126.    Plaintiff and Class Members took reasonable measures to maintain the secrecy of their Trade Secret Materials, including storing them in private Figma workspaces, limiting collaborator access, using authentication measures, restricting external sharing, and relying on Figma's express commitments that users retain full ownership and rights over their content and that such content would not be used for AI training or related purposes without consent.

127.    Plaintiff's and Class Members' Trade Secret Materials relate to products and services used in, intended for use in, or affecting interstate commerce, as required by 18 U.S.C. § 1836(b). Figma itself provides cloud-based design and collaboration services throughout the United States and internationally.

128.    Figma acquired Plaintiff's and Class Members' Trade Secret Materials through "improper means" as defined in 18 U.S.C. § 1839(6), including deception, breach of duties to maintain confidentiality, unfair and misleading revisions to terms of service without meaningful notice, misleading user-interface designs that masked consent mechanisms, and surreptitious extraction and ingestion of private design files and related data into AI-training pipelines.

129.    Figma, without consent, used Plaintiff's and Class Members' Trade Secret Materials to train, develop, validate, and commercialize its AI systems, including generative-design and code-generation tools. This constitutes unauthorized "use" under 18 U.S.C. § 1839(5).

130.    Figma further disclosed the substance, patterns, structure, and embedded logic of Plaintiff's and Class Members' Trade Secret Materials through AI-generated outputs provided to third parties—including competitors—thereby enabling them to replicate or derive from those materials. This constitutes unauthorized "disclosure" under 18 U.S.C. § 1839(5).

131.    Figma knew or had reason to know that it had acquired Plaintiff's and Class Members' Trade Secret Materials through improper means and that its use and disclosure of such materials was unauthorized.  Among other things, Figma deliberately excluded enterprise clients from automatic AI-training enrollment, confirming that Figma understood consent was required and that default inclusion of other users was improper.

132.    Figma's misappropriation was willful and malicious. Its conduct involved deliberate concealment, calculated misleading and unfair term changes, defaults designed to mislead users into believing their work was private, and intentional integration of confidential user content into commercial AI systems.

133.    As a direct and proximate result of Figma's misappropriation, Plaintiff and Class Members suffered and continue to suffer irreparable and ongoing harm, including loss of secrecy, dilution of competitive value, destruction of commercial advantage, permanent embedding of trade secrets within AI model weights, and other damages that cannot be fully remedied through monetary relief.

134.    Plaintiff and Class Members further seek injunctive relief under 18 U.S.C. § 1836(b)(3)(A), including but not limited to: (a) an order prohibiting further use or disclosure of their Trade Secret Materials; (b) deletion, purging, or disabling of all AI models or datasets trained on such materials; and (c) any additional relief necessary to prevent continued or future misappropriation.

## COUNT IV: CALIFORNIA UNFAIR COMPETITION LAW
### (Bus. & Prof. Code § 17200 *et seq.*)

135.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

136.    Figma engaged in an "unlawful, unfair, or fraudulent" business act or practice.

137.    Figma's acts and practice constitute "unlawful" conduct because they violate other statutes and common law duties, including the California Uniform Trade Secrets Act, the Stored

1  Communications Act, and Defend Trade Secrets Act, and common law prohibitions on breach of

2  contract and breach of the implied covenant of good faith and fair dealing.

3      138.    Figma's conduct is unfair within the meaning of the UCL because the harm to consumers

4  from its undisclosed AI training practices outweighs any utility.

5      139.    Figma also engaged in fraudulent business acts because it made statements that were

6  likely to deceive reasonable consumers including, but not limited to "you own your content" or "each

7  party retains all right, title, and interest in and to its intellectual property rights."  These representations

8  were false and misleading and induced consumers to upload and create works on the platform.

9      140.    Plaintiff and Class Members suffered injury in fact and lost money or property because

10  they paid subscription fees and conferred valuable data and creative assets (and would not have done

11  so were they aware of Figma's misconduct); lost control over their intellectual property material; and

12  contributed uncompensated creative labor and expression to Figma's AI-training datasets.

13      **COUNT IV: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

14      141.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

15      142.    Defendant Figma entered into valid and enforceable contracts with Plaintiff and the

16  Class Members, including the Terms of Service governing the use of Figma's design platform.

17      143.    Under California law, every contract contains an implied covenant of good faith and fair

18  dealing, which obligates each party to do nothing that will injure the right of the other party to receive

19  the benefits of the agreement.

20      144.    The implied covenant prevents a contracting party from unfairly frustrating the purpose

21  of the contract or using its discretion in a way that deprives the other party of the contract's benefits,

22  even if no express term is violated.

23      145.    Plaintiff and Class Members entered into the Agreement with the reasonable

24  understanding—based on Figma's representations and the plain terms of the contract—that they

25  retained ownership and control over their creative content.

26      146.    Plaintiff and Class Members expected that, due to Figma's express contractual promises,

27  Figma would not access, use, or exploit their private design files, images, or related project data for

28  training, developing, or commercializing artificial intelligence or machine-learning systems or in such

29

a way that Figma would effectively be providing such data and intellectual property to its other customers.

147.    Plaintiff and Class Members paid subscription fees, provided valuable content, and entrusted their proprietary designs to Figma in reliance on these contractual assurances.

148.    Defendant breached its contractual obligations with Plaintiff and each member of the Class by using their data and works to train Figma's AI models.

149.    As a direct and proximate result of Figma's bad-faith conduct, Plaintiff and Class Members suffered economic injury, including but not limited to: Loss of the benefit of their bargain and overpayment for Figma's services; Loss of the value of their creative works and proprietary design data; and Diminution of privacy, exclusivity, and control over their intellectual property.

## COUNT V: STORED COMMUNICATIONS ACT
### (18 U.S.C. § 2701)

150.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

151.    The SCA provides private causes of action against any person who: (i) "intentionally access without authorization a facility through which an electronic communication service is provided," or (ii) "intentionally exceeds an authorization to access that facility; and thereby obtains, alters or prevents authorized access to a wire or electronic communication while it is in electronic storage in such systems." 18 U.S.C. § 2701(a).

152.    The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

153.    The SCA defines an "electronic communication service" as any service "which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

154.    The Figma services that Plaintiff and Class Members subscribe to provide electronic communications services because they "provide to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Specifically, in the ordinary course of providing its services, Figma receives, stores, processes, and maintains users' private electronic communications

and associated content on its servers, including drafts, private team files, comments, internal messages, collaborative edits, and version histories.

155.    Figma intentionally accessed without authorization or intentionally exceeded authorization to access facilities through which an electronic communications service was provided when it accessed Plaintiff's and Class Members' stored customer data.

156.    Neither the Plaintiff and Class Members nor the third parties to whom they sent communications authorized the extent of Figma's access to their confidential data.

157.    Figma intentionally accessed Plaintiff's and Class Members' data without authorization upon using it to train its AI models.

158.    Plaintiff and Class Members were harmed by Figma's violations and are entitled to injunctive relief.

## COUNT VI: STORED COMMUNICATIONS ACT
### (18 U.S.C. § 2702)

159.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

160.    The SCA also provides private causes of action against any provider of an electronic communication service or remote computing service who knowingly divulges the contents of any communication stored on its service to any person or entity.  18 U.S.C. §§ 2702(a)(1) & (a)(2).

161.    The Figma services that Plaintiff and Class Members subscribe to include electronic communications services because they "provide to users thereof the ability to send or receive wire or electronic communications," and also include remote computing services because they provide "computer storage or processing services by means of an electronic communications system."  18 U.S.C. § 2510(15) & § 2711(2).

162.    Plaintiff and Class Members maintained private data and electronic communications on Figma's cloud-based platform that were not publicly accessible.

163.    In violation of 18 U.S.C. §§ 2702(a)(1) & (a)(2), Figma knowingly divulged the contents of Plaintiff's and Class Members' stored communications without authorization when it: (i) used such communications to train its AI models, which, on information and belief, required Figma to disclose such contents to its third-party AI contractor, OpenAI, and (ii) subsequently used such communications

1    to generate AI outputs that were provided to third-parties. No statutory exception under § 2702(b)

2    applies, and Plaintiff and Class Members never provided knowing or valid consent for these disclosures.

3        164.    Plaintiff and Class Members were harmed by Figma's violations and are entitled to

4    injunctive relief.

## COUNT VII: CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT
### (Cal. Pen. Code § 502)

7        165.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

8        166.    The California legislature enacted the Computer Data Access And Fraud Act

9    ("CDAFA") with the intent of "expand[ing] the degree of protection afforded to individuals . . . from

10   tampering, interference, damage, and unauthorized access to lawfully created computer data and

11   computer systems." Cal. Penal Code §502(a). The enactment of CDAFA was motivated by the finding

12   that "the proliferation of computer technology has resulted in a concomitant proliferation of . . .

13   unauthorized access to computers, computer systems, and computer data." *Id.*

14       167.    The devices that Plaintiff and other Class Members used to access their Figma accounts

15   constitute "computers" within the scope of CDAFA.

16       168.    Defendant violated the following sections of CDAFA:

17           a.    Section 502(c)(1), which makes it unlawful to "knowingly access[] and without

18           permission . . . use[] any data, computer, computer system, or computer network

19           in order to either (A) devise or execute any scheme or artifice to defraud,

20           deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

21           b.    Section 502(c)(2), which makes it unlawful to "knowingly accesses and without

22           permission takes, copies, or makes use of any data from a computer, computer

23           system, or computer network, or takes or copies any supporting documentation,

24           whether existing or residing internal or external to a computer, computer system,

25           or computer network;" and

26           c.    Section 502(c)(7), which makes it unlawful to "knowingly and without

27           permission accesses or causes to be accessed any computer, computer system,

28           or computer network."

169.    Defendant knowingly accessed Plaintiff's and Class Members' data, as alleged more fully above, in order to train its AI models.

170.    As a direct and proximate result of Defendant's unlawful conduct within the meaning of Cal. Penal Code § 502, Defendant has caused loss to Plaintiff and other Class members.

171.    Plaintiff, on behalf of himself and Class Members, seeks injunctive, or other equitable relief.

172.    Plaintiff and other Class Members also are entitled to recover their reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other Class Members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Permanently enjoining Figma from using any AI products or models that were trained, in whole or in part, on Plaintiff's and Class Members' intellectual property materials;

C.    Ordering Figma to delete any AI models trained on Plaintiff and Class Members data; and

D.    Granting Plaintiff and Class Members reasonable attorney's fees and costs as permitted by applicable law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims so triable.

Dated: November 21, 2025                Respectfully Submitted,

                                        /s/ *Carter E. Greenbaum*

                                        Carter E. Greenbaum (SBN 344692)
                                        **GREENBAUM OLBRANTZ LLP**
                                        160 Newport Center Drive, Suite 110
                                        Newport Beach, CA 92660
                                        Tel: (332) 222-9119
                                        Email: carter@greenbaumolbrantz.com

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Casey Olbrantz (*pro hac vice forthcoming*)
**GREENBAUM OLBRANTZ LLP**
244 Fifth Avenue, Suite C221
New York, NY 10001
Tel: (332) 222-9119
Email: casey@greenbaumolbrantz.com

Joseph Delich (*pro hac vice forthcoming*)
Kyle Roche (*pro hac vice forthcoming*)
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th St., Suite 915
New York, NY 10017
Tel: 646-494-2900
Email: jdelich@fnf.law
Email : kroche@fnf.law

Tina Wolfson (SBN 174806)
Theodore W. Maya (SBN 22342)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com

*Attorneys for Plaintiff*

34